USF HEALTH

November 16, 2026

The Honorable Lindsay S. Griffin
United States Magistrate Judge
Middle District of Florida
Tampa Division

Re: Name: Thomas Wayne Markle
Case Number: 8:26-MJ-3344-LSG; 2:26-mj-6499-DUTY

To The Honorable Judge Griffin:

At your request, I conducted a psychiatric evaluation of Mr. Markle for the purpose of determining his competency to proceed. Mr. Markle has a Criminal Complaint of Possession of Child Pornography as defined by 18 U.S.C. § 2252A(a)(5)(B).

**INFORMED CONSENT**

On November 12, 2026, I advised Mr. Markle of the non-confidential nature of the evaluation. I informed Mr. Markle that I was not acting as his personal or treating psychiatrist. I explained that the evaluation was court-ordered by the Judge. I described that I would submit a report to defense counsel, the Assistant United States Attorney, and the Judge documenting all my findings, and that I might one day be called to testify in court. I also clarified that Mr. Markle could choose not to answer my questions and that I would document this in my report. When asked if Mr. Markle understood and would agree to participate, he repeated the information back to me, and he agreed to proceed with the evaluation.

**SOURCES OF INFORMATION**

1. Forensic Psychiatric Interview of Mr. Markle at Pinellas County Jail, lasting approximately 90 minutes, on November 12, 2026;
2. Recorded Interview of Mr. Markle on November 6, 2026, provided by Courtney Derry, Assistant United States Attorney, on November 10, 2026;
3. Telephone call with Kathy Yu on November 10, 2025, lasting approximately ten minutes;
4. Telephone call with Samantha Markle on November 10, 2026, lasting approximately ten minutes;
5. The Club at Lake Gibson Order Summary Report, Dated October 28, 2026, provided by Samantha Markle on November 9, 2026, and "Released on November 6, 2026";
6. Florida Health Care Proxy Designation and Acceptance Letter, provided by Samantha Markle on November 9, 2026;

7. Physician's Evaluation of Resident's Capacity to Make Health Care Decisions or Provide Informed Consent, provided by Samantha Markle on November 9, 2026;
8. Medication List, Dated August 7, 2026, provided by Samantha Markle on November 9, 2026;
9. Medication List, Not Dated, provided by Samantha Markle on November 9, 2026;
10. Power of Attorney, provided by Samantha Markle on November 9, 2026;
11. The Court Order authorizing this evaluation by Judge Lindsay S. Griffin, dated November 6, 2026;
12. The Criminal Complaint, dated November 5, 2026.

**RELEVANT BACKGROUND INFORMATION**

I received the Court Order for this evaluation on Friday, November 6, 2026. I was initially informed that Mr. Markle was residing in an Assisted Living Facility in Lakeland, Florida. I was later informed that he was residing at Samantha Markle's home. We had scheduled an in-person evaluation on Tuesday, November 10, 2026. However, On Tuesday, as I was preparing to drive to Ms. Markle's home, Ms. Markle informed me via email that we would have to reschedule because Mr. Markle was returning to court. Via telephone call, she told me he had used a small knife to remove his ankle monitor. On Wednesday, November 11, 2026, I went to the Pinellas County Jail to conduct the interview. Because it was a holiday, the Pinellas County Jail did not have sufficient staffing to make accommodations. I interviewed Mr. Markle on the afternoon of November 12, 2026.

**FORENSIC PSYCHIATRIC EVALUATION**

The following information, unless stated otherwise, was provided to me by Mr. Markle during the Forensic Psychiatric Interview.

<u>Social History</u>

Mr. Thomas Markle (DOB July 18, 1944) was born and raised in Millersburg, Pennsylvania. He said that he was raised by his married parents and that he had two older brothers. His mother worked at a store called J.J. Newberry, and his father worked for the government. He said his mother is now deceased from, "I think cancer, I am not sure." He said his father died from "also cancer, I think, I take that back, a heart attack." He told me his brother "Mike" died of "old age" a few years ago and that "Fred" is still alive.

When asked about trauma, Mr. Markle said he has had "some family disputes and things like that, not getting along with someone in the family for any number of reasons." He reported no physical, sexual, emotional, or other abuse or neglect when he was younger.

Mr. Markle said that he has a son named Thomas Junior and a daughter named Meghan Markle. He pointed out that I might have heard of Meghan. I inquired about a second daughter because I knew he was residing at Samantha Markle's home earlier that week. He said to me, "I don't think so. I have two kids. I think Meghan is Samantha, I only have one daughter and one son. I think my son is crucifying me at this moment. I always poke him because he never went past the

eighth grade in school. He did not accomplish anything. He dropped out in eighth grade. It was so stupid to not go back to school. At that time, we lived in the valley. He hung out with friends, smoked a lot of weed and stuff. He should have been back in school. I mocked him, the fact that he did get a decent education or try to. I mocked him about it a lot."

Educational History

Mr. Markle said that school "went well, [he] enjoyed it." He said that he graduated high school but did not attend college. He reported no behavioral problems. Later, when asked if he could perform serial subtraction, he declined and said that his grades in math had been "terrible."

Employment History

Mr. Markle said that he worked in "little jobs" as a teenager, like working at the bowling lane. After completing high school, he went to work at Summer Stock theatre in Illinois and a local theater in New Hampshire. He said he worked at Summer Stock theatre there for a few years before transferring to the television station WTTW, a PBS educational station, around age twenty. He said that he worked at WTTW for about twenty years as a lighting designer. He said he then "wound up in a TV station in Los Angeles." He later said, "I do not remember," and said that he was having "memory lapses," but had worked almost his entire lifetime.

Mr. Markle reported that he has been married twice. He initially said he was married to Doria Ragland, Meghan Markle's mother, for a few years. He later recalled being married to "another woman" for "a length of time," which he said was about twenty years. Then he told me he is "reaching back, trying to remember things." He said he did not remember his first wife’s name.

Legal History

I asked Mr. Markle if he had any legal experience or criminal history. He said, "I don't think so. I might have been a witness one time, but I don't recall. Somehow, I know the procedure. It was a car accident, I think. This was something else where the car hit another car. I don't think it got that far. I saw the accident, but it did not get that far."

Substance Use History

Mr. Markle stated that he started smoking one to two packs per day of cigarettes around the age of eighteen. He said that he stopped smoking about ten years ago. He reported no use of cigars, noting that his father used cigars, and he did not like the smell. He reported no routine use of alcohol and described himself as "a holiday drinker." He reported no problems related to alcohol use, such as withdrawals, medical attention, or social problems. He said he has used marijuana "on a couple of occasions, never routine." He reported trying cocaine once. He reported no use of any other substances.

Past Psychiatric History

Mr. Markle said that he has been seeing a therapist but does not know their name. He said that his sister "Meghan" or his brother could help with that. Then he apologized, acknowledged that he has no sister, and reminded me that Meghan Markle is his daughter. He said that he sees a therapist for "forgetfulness," and noted that they do not "do much of anything." He said that he is taking medication but did not recall the name of the medication. He declared multiple times that he is 82 years old, and that is why he has memory deficits. He told me he does not think that he has been diagnosed with depression but said he has been diagnosed with "memory loss." He reported no other psychiatric diagnoses. He reported no history of psychiatric hospitalizations, suicidal ideation, self-harm, or suicide attempts.

Current Psychiatric Symptoms

Mr. Markle reported no current psychiatric symptoms other than memory loss. Near the end of the interview (after discussing the allegation against him), I asked again, and he said, "I don't think so. I am getting depression now!" He reported no thoughts of suicide.

Family Psychiatric History

Mr. Markle said that his father had mental health problems because he was "very into himself all the time." He reported no knowledge of any psychiatric diagnosis. He told me his son, Thomas Junior, has had problems with cannabis and alcohol. He reported no other known family mental health conditions.

Past Medical History

Mr. Markle reported no known drug allergies.

Mr. Markle told me that he has "blood pressure problems; I know that for a fact." He added, "Of course, memory–wise now, and that is pretty much it." He said that he has a "nervous stomach," has been having health problems for "more than ten years," and that he has had two strokes. He reported he has been diagnosed as "prediabetic." He told me his daughter Meghan or his daughter Samantha could tell me the exact times. He repeated, "I take some meds for my mind, my memory, but they do not seem to be working out well." He added, "You will have to forgive me. My memory is gone." He later added that he had kidney stones.

Mr. Markle said "I think I had surgery one time for my kidneys or something like that, inside of my stomach, they opened it up. I had heart attacks." I asked about his amputation. He again stated, I don't know," and then described having a serious fall at his son's home where he could not get up for several days, leading to the lower leg "turning black" and needing an amputation. He said this happened a few years ago.

Current Medications

Mr. Markle said he did not know what medications he was taking. The following list was provided to me by Samantha Markle via email. They appear to be from The Club at Lake Gibson, an Assisted Living Facility, and are dated October 28, 2026.

Scheduled Medications:

Atorvastatin Calcium *(cholesterol lowering agent)* 20 mg, by mouth at bedtime
Bupropion *(antidepressant)* 75 mg, by mouth twice daily
Carvedilol *(antihypertensive)* 6.25 mg, by mouth twice daily
Clopidogrel *(antiplatelet)* 75 mg, by mouth daily
Cyanocobalamin *(Vitamin B12 supplement)* 100 mcg, by mouth daily
Dapagliflozin *(SGLT2 Inhibitor)* 10 mg, by mouth daily
Oxybutynin *(anticholinergic for urinary frequency)* 10 mg, by mouth daily
Donepezil *(cognitive enhancer)* 5 mg, by mouth daily
Apixaban *(blood thinner)* 5 mg, by mouth twice daily
Men's Multivitamin *(multivitamin supplement)* 1 gummy, by mouth daily
Proteinex *(amino acid supplement)* 1 unit every day for constipation
Sacubitril-Valsartan *(antihypertensive)* 24-26 mg, by mouth daily
Spironolactone *(antihypertensive)* 25 mg, by mouth twice daily

As Needed Medications:

Magnesium citrate *(laxative)* 296 mL, by mouth daily as needed for constipation
Bisacodyl *(laxative)* 1 rectal suppository, daily as needed for constipation
Fleet enema *(laxative)* daily as needed for constipation
Glucagon *(for blood sugar)* every 30 minutes as needed for low blood sugar
Glucose gel (*for blood sugar)* every 15 minutes as needed for low blood sugar
Lidocaine Topical Patch *(topical analgesic)* every 12 hours as needed for lower back pain
Melatonin *(sleep aid)* 5 mg, by mouth as needed for sleep at bedtime
Milk of Magnesia *(laxative)* 30 mL, daily as needed for constipation
Narcan *(opiate antagonist)* 1 spray every 2 minutes, as needed for emergent opiate reversal
Nitroglycerin *(vasodilator)* 1 tablet every 5 minutes, as needed for chest pain
Tylenol *(anti-inflammatory)* 325 mg, by mouth every 6 hours as needed for pain

When asked about social support given his health conditions, Mr. Markle listed his friend, Carolyn, and his daughter Samantha. He then told me again that he has memory loss. I told him that we would proceed with questions related to cognition and competency. He said, "Okay, well good luck. I am having a lot of problems with memory right now."

Mental Status Examination on November 12, 2026

Mr. Markle is an 82-year-old male who appeared his stated age. His hair was combed neatly, and he was dressed in jail-issued attire. His left leg was amputated below the knee. He was sitting upright in bed for the interview. We were in the medical unit of the jail. Mr. Markle's grooming

and hygiene were fair, but his nail beds were dirty. Mr. Markle's behavior was calm and cooperative. Mr. Markle made good eye contact.

Mr. Markle described his current mood as, "You'll have to forgive me, my memory is gone." He had a constricted range of emotional expressions with appropriate reactivity to discussion. When discussing the allegation against him, his face flushed. He had a regular rate of speech with normal volume and softened tone. He stuttered often. He had a logical, linear, and goal-directed thought process.

He reported no auditory or visual hallucinations, and there was no behavioral evidence of hallucinations. Thise was no evidence of a thought disorder or paranoia. He did not express delusional thinking. He reported no self-injurious thoughts, self-injurious behavior, suicidal thoughts, or homicidal thoughts.

Mr. Markle was alert and oriented to his name and the situation. He initially told me he is aged "82 or 81, I'm guessing," but later stated multiple times that he is 82 years old and has problems with memory. He told me he thought he was in the hospital for his heart, but later said, "I am currently in jail, I guess." I asked what city he was in. He said, "I have no idea. LA! Or Florida."

His concentration was limited. For example, he spelled *WORLD* backwards as "D, L, O, R, W." His attention was good throughout the interview, evidenced by his responses detailed below. Additionally, when another inmate started shouting excitedly and ran in front of Mr. Markle's cell with only a blanket covering his bottom, Mr. Markle maintained appropriate composure.

Mr. Markle demonstrated good short-term memory as he recalled information provided throughout the interview and referred to the information as we proceeded. He had a mildly impaired long-term memory, as he provided information about his own remote personal history but frequently recalled additional information after further discussion. His vocabulary and interaction during the interview suggested that his fund of knowledge is average, and his current intellectual functioning is average for his age group.

Mr. Markle's ability to think abstractly was good, evidenced by his interpretation of various proverbs and categorical similarity between paired items. For example, when he was asked about the relationship between a table and chair, he said, "They are both wood and they are both for lunch or dinner. They are furniture." Furthermore, he described the similarity between a train and a car to be, "They are both transportation." Mr. Markle interpreted the proverb *What goes around comes around* to mean, "That's a saying I use a lot and my mother used to say all the time, ‘If you do something bad, it's going to come back on you sometime.’" He interpreted the proverb *People who live in glass houses shouldn't throw stones* to mean, "If you live in a glass house, you're bound to be in a broken house if you throw stones at anyone, I guess. I am sorry! I mean – we all live in glass houses, we all have our secrets, and we all have our revelations."

Mr. Markle demonstrated good insight into the seriousness of his allegation. He demonstrated fair judgment throughout the evaluation and based on his response to hypothetical plea bargaining and hypothetical judgment scenarios. For example, when asked what he would do if

he found a stamped, sealed envelope on the ground near the mailbox, he stated, "Pick it up and drop it in the mailbox. Pick it up first, certainly check it, then drop it in the mailbox." When asked what he would do if he were the first person to see a small fire in a movie theater, he stated, "Stand up and yell, 'Fire!'"

I also asked Mr. Markle a series of straightforward questions to determine his effort and possible exaggeration of cognitive deficits. He stated the main ingredient in apple pie is "apples," and noted that an apple pie leads to "good times!" He stated that a dog has "four" legs. He accurately stated that the Independence Day occurs in "July." He said the main colors in the American flag are "red, white, and blue."

**COMPETENCY ASSESSMENT ON NOVEMBER 12, 2026**

When I asked Mr. Markle to describe the allegation against him, he said, "I don't understand about the case at all." I informed Mr. Markle of his charge of Possession of Child Pornography as it is listed in the Criminal Complaint. Mr. Markle told me, "I have no idea. I don't know about the charge. I don't know, I don't know, I don't know. Why I am here. What have I done?" I described the allegation to him again. He said, "I don't have any child porn. I have no pictures of naked kids. I don't have pictures of naked kids. My son has pictures of naked children. My son, Thomas Junior. He said he had this. He showed me something. I never saw the picture. He said something to that, I guess. I vaguely remember that, as well. I don't have any pictures of anyone to my knowledge." I affirmed that Mr. Markle understood the allegation, and he repeated, "Naked pictures. I don't have any naked pictures."

When I asked Mr. Markle about the definition of a defendant, he said, "The party that is accused of being guilty."

I asked Mr. Markle about the role of the defense attorney. He stated, "To prove that I am not guilty." He later added, "My attorney protects me."

I asked Mr. Markle about the role of the prosecuting attorney. He stated, "To prove that I was guilty." I asked him why the prosecuting attorney is trying to prove he is guilty, and he said, "The state. I guess... I have no idea... They assume I am guilty. But I have nothing like that! I have no possession of anything like that, so okay. I don't know the situation. I am assuming it is their job."

I asked Mr. Markle to tell me about the role of the jury. He stated, "A group of people that decide your innocence or guilt." When asked about the role of the Judge, Mr. Markle stated, "A Judge tries you." I asked Mr. Markle about the differences between a bench trial and a jury trial. He said he did not know, but after education, he said, "A jury trial is ten to twelve people judging me based on the information. A Judge trial is the Judge making that decision."

When asked to describe the role of a witness, Mr. Markle stated, "A witness is a person that identifies the crime. A jury witness hears information and makes a decision based off of that." I described other potential witness types, such as an expert witness. Mr. Markle listened intently. He described evidence as, "Something that can put you in jail or could get you out of the jail." I

asked him to consider potential evidence in his case. He said, "I don't know." I told him the allegation again and he said, "I guess you just told me. Well, look. I am trying to look at my history, but I don't have anything that you would call child pornography. I don't have anything that shows children involved sexually." I asked him to consider potential evidence if another hypothetical individual, not him, had the same allegation. He said, "They would have to have photographs that he has of children."

When asked about available pleas, Mr. Markle answered, "You can plead guilty. You can plead innocent." I asked Mr. Markle to describe what happens after someone pleads *guilty*. He stated, "Charged and convicted." I also asked Mr. Markle to describe the plea of *not guilty*. He answered, "Then you'd have to prove me guilty." I asked what he meant, and he acknowledged that the case would proceed to trial. He correctly stated someone would be "free to go" if adjudicated *not guilty.* When asked about a plea of *not guilty by reason of insanity*, Mr. Markle stated, "If I am nuts, I am not guilty. Because I am nuts, I can't be found guilty." I explained that an individual may be committed to psychiatric treatment if adjudicated *not guilty by reason of insanity*, potentially for longer than maximum sentencing.

I asked Mr. Markle again to state the allegation against him. He said, "You just told me. I am charged with having pornography." I corrected him that the allegation is Possession of Child Pornography. Mr. Markle said, "I am assuming it is a serious charge, but I have never seen that, and I don't know where the pornography is. I have no pornography." I asked if a charge of Possession of Child Pornography would be a felony or a misdemeanor. He said, "A felony of course." I told him the charge can lead to a sentence of up to twenty years of incarceration. He estimated that potential penalties may include "Hanging, I guess?" When asked about additional penalties, Mr. Markle listed, "I guess community service and some things like that." I described examples of other penalties like probation or restitution, and he nodded in agreement.

I asked Mr. Markle to tell me about the process of a plea bargain. He stated, "Well I don't know what the case is. Okay, I don't remember being charged." I redirected him to describe a plea bargain. He said, "It would be an admission of guilt. I don't know the circumstances. It is an admission of guilty. But... I have porn somewhere. I don't think I have kiddie. I don't think I have child pornography, I don't know." He accurately stated the rights waived in a plea bargain, including the right to appeal or go to trial.

I provided three hypothetical plea bargains for Mr. Markle to appraise for the allegation of Possession of Child Pornography, given a maximum sentence of twenty years of incarceration. I asked if he would consider time served and one year of probation. He said, "Of course it would be a good deal." I asked if he would consider the death penalty. He said, "No!" I asked if he would consider five years of incarceration and five years of supervised release. He said, "That would be a death penalty for me. I won't live that long. Probably a couple of years at best because I probably won't live that long. I am 82."

Mr. Markle then interjected to tell me, "I just remembered something like this came up years ago in the Philippines, Something like child pornography then. I didn't have anything. I am guessing it was not way back. I think I am remembering something more immediate." I asked for clarification, because he previously told me he had not lived outside of the United States, and we

had not referenced the Philippines at any time in the interview. He told me, "I didn't live in the Philippines. I went for vacation maybe three times in my life. I had a girlfriend there, for one – a legal aged girlfriend – and a lot of friends there as well." He told me he met his girlfriend through a friend and exclaimed, "She was well over the age of consent!" I asked him the age of consent in the Philippines. He said he did not know but guessed it was eighteen. He said, "I never really had to know [the age of consent] that because, like, Okay."

Mr. Markle said he did not know his attorney's name. I asked if he met her. He said, "I might have. I am not sure. I don't remember a lot of stuff. Somehow, this whole thing. I think my son is involved with this. It just sounds like something he would do. My son hates me. He has never accomplished anything. I poke at him all the time. He has not accomplished anything. It's a huge allegation." I redirected Mr. Markle to answer questions related to competency. I asked him if he trusts his attorney. He said, "Yeah, I guess so. Yeah, of course." I asked how he can assist his attorney. He said, "By telling her everything I know." Mr. Markle indicated that appropriate courtroom behavior includes "I tell the truth." I asked Mr. Markle what he would do if a witness lied about him in court. He stated, "I am not sure about that part. If you say things about me, I have to defend myself." When asked if he would be comfortable testifying, Mr. Markle stated, "I probably would. It is a serious accusation. Because it is serious. I am not an evil person. I think I am respected."

I asked Mr. Markle again to describe the allegation against him. He said, "You have said child pornography. Very serious. I am sure it's felony. I am sure it's prison time."

I asked Mr. Markle if there was anything else he would like for me to know. He said, "At this point I don't remember anything. How old are these pictures? I only was in the Philippines for a few days total. Not with kids! But there's nothing incriminating in the Philippines either. No pornography. No obscene stuff. I don't remember posing for anything. This sounds like my son is trying to set me up."

**SUMMARY OF SELECTED COLLATERAL RECORDS**

On Saturday, November 7, 2026, I requested medical, neurological, and psychiatric records pertaining to Mr. Markle's recent or previous mental health and functioning from Mary Claire Wolf, Esq. (defense counsel). She told me they were not available in the short timeframe.

<u>Recorded Interview of Mr. Markle on November 6, 2026, provided by Courtney Derry, Assistant United States Attorney, on November 10, 2026</u>

Within the first three minutes of the interview, Mr. Markle said, "I saw the news, but not pornographic news." He recalled vacationing in the Philippines and then added, "I don't really remember, I am 82." About 30 seconds later he said this again as he reported limited recall of events in the Philippines. He said, "I am 82, I don't remember." He recalled information about his employment and previous places he lived, but said, "I am not sure, you're asking an 82-year-old man for questioning, I can't remember..." He said that he thinks his son is "trying to get him arrested for pornography." Throughout the interview, he often states, "I don't know, I can't

remember," but later corrects the interviewer about his autobiographical history and provides clear details related to questions.

<u>Telephone call with Kathy Yu on November 10, 2025, lasting approximately ten minutes</u>

Ms. Yu provided me with highlighted excerpts from the recorded interview with Mr. Markle that the team found relevant regarding his memory. She also provided several links to Mr. Markle's interviews with the press which were dated October 23, 2026, and October 25, 2026. Additionally, she sent a picture of notes Mr. Markle had written when he was approached for arrest. The picture had the phrases "Go to LA Secure Lockers," "There is no porn in the lockers!!," "Caroline Grahm," "Go to L.A.," and "LA-NOW." Ms. Yu pointed out that the complaint was still sealed when he wrote those notes.

<u>Telephone call with Samantha Markle on November 10, 2026, lasting approximately ten minutes</u>

I had a brief phone call with Ms. Markle on the date I was supposed to evaluate Mr. Markle, after she emailed me that he was being transported to court. She was adamant that he had dementia and that he was too dysregulated to proceed. She said he was acting angrily toward her and that he cut off his ankle monitor overnight. I redirected the conversation several times to determine where I could evaluate Mr. Markle. She continued to express her concerns about his mental status, stating he is too demented to proceed, and then referred me to contact his attorney.

<u>The Club at Lake Gibson Order Summary Report, Dated October 28, 2026, provided by Samantha Markle on November 9, 2026, and "Released on November 6, 2026"</u>

Mr. Markle's medications were listed above. Additionally, this report lists Claudio Manubens, MD, (cardiology), as Mr. Markle's primary attending physician. Listed diagnoses included:

- Gallstones
- Obesity
- Atrial fibrillation
- Polycythemia vera
- Below the knee amputation
- History of Transient Ischemic Attack (TIA) and Cerebral Infarction without residual deficits
- Metabolic syndrome
- Heart disease
- Generalized muscle weakness
- Need for assistance with personal care
- Insomnia
- Unspecified dementia, unspecified severity, without behavioral disturbance, psychotic disturbance, mood disturbance, and anxiety
- Type II diabetes without complications
- Mixed hyperlipidemia
- Essential hypertension (elevated blood pressure)
- Cardiomyopathy

- Muscle wasting and atrophy
- Difficulty in walking
- Major depressive disorder, recurrent, moderate

"Transfer Power of Attorney", provided by Samantha Markle on November 9, 2026

Ms. Markle provided the image of a handwritten note that says Thomas Markle Junior is transferring power of attorney to his sister, Samantha Markle, for Thomas Markle Senior, on September 9, 2026.

Florida Health Care Proxy Designation and Acceptance Letter, provided by Samantha Markle on November 9, 2026

Ms. Markle provided a document appointing her as Mr. Markle's health care proxy on August 8, 2026.

Physician's Evaluation of Resident's Capacity to Make Health Care Decisions or Provide Informed Consent, provided by Samantha Markle on November 9, 2026

Ms. Markle provided a screen shot of a page dated August 8, 2026. The page does not have an attending physician's signature.

Medication List, Dated August 7, 2026, provided by Samantha Markle on November 9, 2026

Ms. Markle provided a medication list similar to the listed one above. The list included blood thinners, cholesterol medications, medications for blood pressure and diabetes, and a few supplements. There were no medications for cognitive enhancement or depression.

Medication List, Not Dated, provided by Samantha Markle on November 9, 2026

Ms. Markle provided a medication list like the listed one above, from when Mr. Markle was aged 81. He had a diagnosis of acute limb ischemia of the left lower extremity, ischemic cardiomyopathy with non-sustained ventricular tachycardia, and atrial fibrillation. There were no medications for cognitive enhancement or depression.

Power of Attorney, provided by Samantha Markle on November 9, 2026

Ms. Markle provided a screenshot of a page designating Thomas Markle Junior as Thomas Markle Senior's Power of Attorney, dated September 28, 2023. She also provided an image of notarization on that date.

**CURRENT DSM-5-TR DIAGNOSES**

1. Major Neurocognitive Disorder, Possibly due to vascular disease, Without behavioral disturbance, Mild
2. Malingering

Major Neurocognitive Disorder, Possibly due to vascular disease, Without behavioral disturbance, Mild

It is my opinion, with reasonable medical certainty, that Mr. Markle meets the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision (DSM-5-TR) criteria for the diagnosis of major neurocognitive disorder, possibly due vascular disease, without behavioral disturbance, mild.

The category of "Major Neurocognitive Disorder" applies to individuals who demonstrate a significant cognitive decline from a previous level performance in one or more cognitive domains based on:

1. Concern of the individual, a knowledgeable informant, or the clinician that there has been a significant decline in cognitive function; and

2. A substantial impairment in cognitive performance, preferably documented by standardized neuropsychological testing or, in its absence, another quantified clinical assessment.

The specifier "Without behavioral disturbance" applies if there is no clinically significant behavioral disturbance.

The specifier "Mild" applies when the cognitive deficits interfere with independence in everyday activities. For example, at a minimum, requiring assistance with complex instrumental activities of daily living such as housework/managing medications. Cognitive deficits do not occur exclusively in the context of delirium and are not better explained by another mental disorder.

A "Possible vascular neurocognitive disorder" is diagnosed if the clinical features are consistent with a vascular etiology (onset of deficits related to one or more cerebrovascular events or there is a decline prominent in complex attention and frontal-executive dysfunction) but neuroimaging is not available and the temporal relationship of the neurocognitive syndrome with one or more vascular events is not established.

Of note, per the DSM-5-TR, the distinction between "Major Neurocognitive Disorder" and "Mild Neurocognitive Disorder" is inherently arbitrary, and the disorders exist along a continuum. Precise thresholds are difficult to determine. The boundary between a Mild Neurocognitive Disorder and a Major Neurocognitive Disorder, Mild, relies on the distinction between whether cognitive deficits interfere with the capacity for independence in everyday activities. For example, complex instrumental activities of daily living such as paying bills or managing medications are preserved but require greater effort/compensatory strategies/accommodation in Mild Neurocognitive Disorder. However, complex instrumental activities of daily living such as paying bills or managing medications require assistance in Major Neurocognitive Disorder.

It is my opinion that Mr. Markle meets the criteria for a major neurocognitive disorder, possibly due to vascular disease, without behavioral disturbance, mild, because he has deficits in complex instrumental activities of daily living.

He is not remembering to take his medications on his own. He did not recall the names of his medications. He was residing in an assisted living facility. His daughter has expressed concerns about his functioning. He is also currently being treated for "Unspecified dementia, unspecified severity, without behavioral disturbance, psychotic disturbance, mood disturbance, and anxiety" with donepezil, a cognitive enhancing medication. I do not have any available neuroimaging, but I have been informed he has had multiple TIA's. He has established heart disease, and he has high blood pressure, making this possibly due to a vascular etiology.

Malingering

It is also my opinion, with reasonable medical certainty, that Mr. Markle meets the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision (DSM-5-TR) criteria for the diagnosis of Malingering.

It is my opinion, with reasonable medical certainty, that even though Mr. Markle does have the above diagnosis of a neurocognitive disorder, when he repeatedly states he does not understand or recall the allegation, he is malingering. The essential feature of malingering is the production of false or grossly exaggerated physical or psychological problems, motivated by external incentives. He stated excessively, "I don't know," diverting attention to his age and neurocognitive disorder, before providing additional information. He understood the seriousness of the nature of the charges. It is my clinical opinion, with reasonable medical certainty, that Mr. Markle is malingering because he is exaggerating a lack of recall or understanding of the charges in order to avoid criminal prosecution.

Consideration of other psychiatric diagnoses

Mr. Markle is being treated for "Major depressive disorder, recurrent, moderate" with bupropion, and antidepressant medication. However, at the time of my evaluation, Mr. Markle reported no previous or current symptoms of depression. I do not have enough information to substantiate this diagnosis.

Consideration of psychological testing

I carefully considered whether Mr. Markle was feigning or exaggerating his symptoms of memory impairment overall. Mr. Markle performed well in informal cognitive questioning (described in the mental status examination). A basic screening for malingering general factual knowledge did not reveal any malingering. He appeared to be putting forth good effort.

I considered administering testing for malingered deficits in short-term recall, specifically given the claims that he did not remember his allegation. Even though Mr. Markle initially reported he did not remember the allegation against him, he did recall the allegation throughout the evaluation of his competency. He referenced the allegation repeatedly, using first-person

pronouns, and he consistently described what could be a defense strategy: alternating between not remembering information related to the allegation or stating his son was involved. Furthermore, Mr. Markle independently volunteered information about traveling to the Philippines near the end of the evaluation, suggesting he was able to recall relevant information with prompting.

There is no psychological test which can definitively state whether Mr. Markle is feigning deficits of recalling his own charges. As per above, it is my opinion that Mr. Markle was exaggerating deficits of remembering the allegation, but he is still able to proceed with his case, because he was able to recall the allegation throughout our discussion and use the information to strategize in a way that was favorable for himself.

I also considered administering testing for malingered deficits in legal knowledge. However, Mr. Markle did not display deficits in legal knowledge. Furthermore, I considered administering testing for malingering psychiatric symptoms. However, other than memory, Mr. Markle reported no current psychiatric symptoms.

I recognize that this is a case which receives a high level of public attention. However, it is not my standard protocol to administer psychological testing when a defendant has clearly met the threshold for competency to proceed. It was my opinion that it would not be appropriate to administer extraneous testing solely because of Mr. Markle's public status.

The Court may wish to consider that Mr. Markle has health complications (high blood pressure, high cholesterol, diabetes, obesity, atrial fibrillation and cardiomyopathy of the heart, history of TIA), which place him at elevated risk of stroke and/or further cognitive decline secondary to vascular disease. These health conditions are independent of apparently recent diagnoses of neurocognitive disorder or depression.

**FINDINGS AND RECOMMENDATIONS**

It is my opinion, with reasonable medical certainty, that Mr. Markle does have sufficient present ability to understand the nature and consequences of the proceedings against him and to assist properly in his defense. Thus, it is my opinion, with reasonable medical certainty, that Mr. Markle is competent to stand trial.

I considered the following factors in my opinion:

1. *Can Mr. Markle appreciate the charges or allegation?*

   Yes. Mr. Markle was able to accurately describe the allegation against him. He repeated the information back to me several times, retained the information, and recognized that he was the defendant throughout the interview. He appreciated the seriousness of the allegation.

2. *Can Mr. Markle appreciate the range and nature of possible penalties, if applicable, which may be imposed in the proceedings?*

Yes. Mr. Markle was able to identify potential sentencing that he could receive if convicted. He considered this information in hypothetical plea-bargaining scenarios and made choices which would be favorable for himself that also accounted for his health.

3. *Can Mr. Markle understand the adversarial nature of the legal process?*

   Yes. Mr. Markle accurately described the roles and allegiances of courtroom participants.

4. *Can Mr. Markle disclose to his defense attorney facts pertinent to the proceedings at issue?*

   Yes. Mr. Markle independently provided additional information related to the allegation. He did not describe any distrust or paranoia that would interfere with his ability to relate to his attorney.

5. *Can Mr. Markle manifest appropriate courtroom behavior?*

   Yes. Mr. Markle identified appropriate courtroom behavior. He was socially appropriate with me and gave no indications that he would engage in inappropriate behavior while in court. He was also appropriate when another inmate was disruptive nearby.

6. *Can Mr. Markle testify relevantly?*

   Yes. When I asked Mr. Markle for an account of the alleged offense, he provided a rational and consistent defense, which did not appear to be influenced by mental illness or intellectual disability.

**SUMMARY**

It is my opinion, with reasonable medical certainty, that Mr. Markle is competent to stand trial. It is my opinion, with reasonable medical certainty, that Mr. Markle does have sufficient present ability to understand the nature and consequences of the proceedings against him and to assist properly in his defense.

This opinion is based on the information provided to me as noted in the sources of information above. This was an evaluation performed under time constraints and was primarily formed from the direct interview of Mr. Markle. If additional records were made available to me in the future, I would consider them in my opinion.

Respectfully submitted,

Amie Gerodimos, D.O.
Assistant Professor, Department of Psychiatry and Behavioral Neurosciences

University of South Florida

Cc: Courtney Derry, Assistant United States Attorney

Cc: Mary Claire Wolf, Esq., defense counsel